O

JS-6

cc: order, docket, remand letter to
Los Angeles Superior Court, West District,
Santa Monica, No. Bc 505548

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA SANDERSON,<br><br>             Plaintiff,<br>    v.<br><br>GARTH BROOKS, an individual; RED STROKES ENTERTAINMENT, INC.; and DOES 1–10, inclusive,<br><br>             Defendants. | Case No. CV13-03497-ODW (SHx)<br><br>**ORDER REMANDING CASE TO LOS ANGELES SUPERIOR COURT** |

## I. INTRODUCTION

Defendants Garth Brooks and Red Strokes Entertainment, Inc. removed Plaintiff Lisa Sanderson's state-court action to this Court on diversity grounds. They assert that Red Strokes, as an inactive corporation, is a citizen only of its state of incorporation (Tennessee) for diversity purposes. Because Brooks is an Oklahoma citizen and Sanderson is a citizen of California, Defendants assert that complete diversity exists. But Sanderson contends that Red Strokes is a California citizen for diversity purposes and seeks to have the case remanded to state court. Presently, there is no controlling precedent on the appropriate determination of an inactive corporation's citizenship. After carefully considering the parties' papers, the approaches taken by other circuits, and the statute itself, the Court finds that a "last

principal place of business" approach is the best determination of an inactive corporation's citizenship. Because Red Strokes's last principal place of business while it was active was in California, complete diversity is lacking between Red Strokes and Sanderson. Accordingly, the case is hereby **REMANDED** to Los Angeles County Superior Court for lack of subject-matter jurisdiction.

## II. BACKGROUND

In 1993, country-music artist Garth Brooks invited Lisa Sanderson Sanderson to join him in forming a production company. (Sanderson Decl. ¶ 5.)[1] She orally agreed to certain employment conditions irrelevant to the Court's discussion here. Brooks then founded Red Strokes—an entertainment company that developed and produced film and television projects—in 1994 while he was living in Tennessee. (Brooks Decl. ¶ 5, Sanderson Decl. ¶ 2.) The company was incorporated in Tennessee. (Notice of Removal ¶ 13.) Sanderson was named the Chief Executive Officer and Producing Partner; Brooks was the president and sole shareholder. (Sanderson Decl. ¶ 5.) Red Strokes had no other officers, directors, or shareholders. (*Id.*)

Sanderson's job entailed overseeing day-to-day operations; deciding which projects to pursue; making casting and hiring decisions; attending meetings with studio executives, financiers, and talent; networking within the entertainment community; making project promotion decisions; and supervising pre-and post-production projects, among other things. (*Id.* ¶¶ 11, 13–14, 18.) Sanderson cites to these activities in relation to several specific projects, which span from 2001 until 2010. (*Id.* ¶¶ 15–22.) Though Brooks traveled frequently, Sanderson arranged for him to accompany her to the pitch meetings in Los Angeles County. (*Id.* ¶¶ 12, 14.) Since the entertainment business is centered in Southern California, most (if not all) of Sanderson's activities on behalf of Red Strokes occurred in Los Angeles, either at the

---

[1] The Court has received the parties' voluminous evidentiary objections. To the extent that the Court addresses any disputed evidence in this Order, the parties' objections with respect to that evidence are hereby **OVERRULED**.

Red Strokes office or at the offices of other entertainment industry executives. (*E.g.*, *id.* ¶ 26.)

From 1998 until its doors finally closed in early 2011, Red Strokes's only office was in Beverly Hills. (*Id.* ¶¶ 8, 23–24.) It had one employee, California resident Anka Brazell, who assisted Brooks and Sanderson from the Beverly Hills office for five years prior to Red Strokes going inactive. (*Id.* ¶ 9.) Brooks also hired an outside accounting company in Tennessee to provide accounting and payroll services for Red Strokes; various Red Strokes documents were also maintained in Tennessee, at least until 2000. (*Id.* ¶ 28; Brooks Decl. ¶ 5.)

Since the corporation went inactive, "Red Strokes has not engaged in any business activities other than those incidental to the winding up of its operations," such as making final payments and filing tax reports and similar documents. (Brooks Decl. ¶¶ 6, 8.) Red Strokes continued its final "winding up" activities in Tennessee for no more than two to three months in late 2010 and early 2011. (*See id.*)

After Red Strokes went defunct, Sanderson began complaining that Red Strokes took unauthorized deductions from her paychecks from May until October 2011, and has neglected to pay her due wages, a 50 percent producing fee, and a $250,000 severance bonus that was allegedly agreed to when she took the job. Perhaps in response to these contentions, Brooks and Red Strokes filed a lawsuit against Sanderson in November 2011 in a Tennessee state court, claiming that she had defaulted on a subsequent oral loan agreement, and seeking a declaratory judgment against Sanderson's allegations. (Notice of Removal ¶ 27.) Sanderson removed the Tennessee case to the United States District Court for the Middle District of Tennessee on diversity grounds; the action is still pending. (*Id.* ¶¶ 26, 28.)

On April 15, 2013, Sanderson brought this action against Garth Brooks and Red Strokes in California Superior Court; Defendants removed it to this District on diversity grounds. (ECF No. 1.) Here—in contradiction to her position in the Tennessee case—Sanderson contends the parties are not diverse and the case should

be remanded for lack of jurisdiction. (ECF No. 12.) Aside from disputing Red Strokes current citizenship, Defendants also argue that Sanderson should be estopped from arguing for diversity jurisdiction because it conflicts with her assertions in the Tennessee action. (ECF No. 16.) Sanderson's Motion to Remand is now before the Court for decision.

## III. LEGAL STANDARD

Federal courts are courts of limited jurisdiction, having subject-matter jurisdiction only over matters authorized by the Constitution and Congress. U.S. Const. art. III, § 2, cl. 1; *e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A defendant may remove a suit to federal court if the federal court would have had original jurisdiction over the case. 28 U.S.C. § 1441(a). But Ninth Circuit courts strictly construe § 1441 against a finding of removal jurisdiction. "[F]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). The party seeking removal bears the burden of establishing federal jurisdiction by a preponderance of the evidence. *Geographic Expeditions, Inc. v. Estate of Lhotka ex rel Lhotka*, 599 F.3d 1102, 1106–07 (9th Cir. 2010).

Federal courts have original jurisdiction where an action presents a federal question under 28 U.S.C. § 1331, or diversity of citizenship under 28 U.S.C. § 1332. Defendants here ground their removal petition solely on diversity. (Notice of Removal ¶ 1.) To exercise diversity jurisdiction, a federal court must find complete diversity of citizenship among the adverse parties, and the amount in controversy must exceed $75,000, usually exclusive of interest and costs. 28 U.S.C. § 1332(a).

## IV. DISCUSSION

For diversity purposes, a corporation is a citizen of both the state where it is incorporated and the state where it has its principal place of business. 28 U.S.C. § 1332(c). The Supreme Court has recently clarified that a corporation's principal place of business is the corporation's "nerve center"—"where a corporation's officers

direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 599 U.S. 77, 92–93 (2010).

Diversity of citizenship is determined at the time a complaint is filed. *Mann v. City of Tuscon*, 782 F.2d 790, 794 (9th Cir. 1986). But Red Strokes was already inactive—and thus had no active principal place of business—when Sanderson filed her Complaint. There is presently no controlling Ninth Circuit or Supreme Court authority regarding the citizenship of an inactive corporation under § 1332(c). The Court must therefore begin by determining where, if anywhere, a defunct corporation has its principal place of business.

## A. Citizenship of Inactive Corporations

While the Ninth Circuit has never opined on the principal place of business of an inactive corporation, a split of authority has developed among the circuits that have. The courts that have passed on the issue have focused on the underlying purpose of diversity jurisdiction and the plain meaning of § 1332(c), as well as the congressional intent behind the statute's 1958 amendment that expanded the definition of a corporation's citizenship to include its principal place of business. *See Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1071 (11th Cir. 2012), *cert. dismissed*, 133 S. Ct. 499 (2012); *Athena Auto., Inc. v. DiGregorio*, 166 F.3d 288 (4th Cir. 1999); *Midatlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir. 1995), *cert. dismissed*, 116 S. Ct. 32 (1995); *Harris v. Black Clawson Co.*, 961 F.2d 547, 551 (5th Cir. 1992); *William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 141 (2d Cir. 1991). Three predominate approaches have emerged. It is important to keep in mind, however, that the principal cases establishing these tests were decided before *Hertz Corp. v. Friend*, in which the Supreme Court shunned "complex jurisdictional tests" in favor of administrative simplicity and predictability. 599 U.S. at 79.

/ / /

/ / /

1 The Third and Eleventh Circuits hold that an inactive corporation has no principal place of business at all and is therefore a citizen of its state incorporation only. *Midatlantic*, 48 F.3d at 696; *Holston Invs.*, 677 F.3d at 1071. Though this approach is "bright-line," it runs counter to the congressional purpose behind the 1958 amendment: putting an end to the "evil" that enabled local institutions to assert diversity jurisdiction based solely on their state of incorporation, even where the corporation had established local ties. *Midatlantic*, 48 F.3d at 701 (Seitz, J., dubitante); S. Rep. No. 85-1830 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3099, 3101–02. When a corporation is deemed to be a citizen only in its state of incorporation, the probability of complete diversity increases, and so this approach also impinges on Congress's expressed intention to limit federal jurisdiction and to ease the congestion of federal courts' dockets. *See* S. Rep. No. 85-1830, (1958), *reprinted in* 1958 U.S.C.C.A.N. 3099, at 311 ("One of the principal aims of [the 1332(c) amendment] is to alleviate the crowded conditions in the district courts . . . by eliminating the filing of cases which concern purely local in nature, though one of the parties may be a corporation [incorporated] in another state . . . .")

While the Fourth and Fifth Circuits better restrict federal jurisdiction, their case-by-case approach is at odds with the recent *Hertz* directive to steer clear of complex jurisdictional tests. *Hertz*, 599 U.S. at 79. The Fifth Circuit has held that an inactive corporation's last place of business is relevant to the citizenship determination, but is not dispositive of a principal place of business. *Harris*, 961 F.2d at 551. Under this approach, a court need only determine a corporation's principal place of business if it decides the corporation has not been inactive for a "substantial length of time." *Id.* The Fifth Circuit found five years of inactivity in the forum was "substantial." *Id.* Applying a similar approach, the Fourth Circuit found three years of inactivity in the forum was "substantial." *Athena Auto*, 166 F.3d 288, 292. Where a corporation has been inactive in a state for the discretionarily determined

/ / /

"substantial" period, that state is not its principal place of business. *Harris*, 961 F.2d at 551.

In addition to requiring courts to analyze whether the inactive period is "substantial" on a case-by-case basis, the "substantial length of time" test—like the Third and Eleventh Circuits' approaches—also overlooks a requisite element of corporate citizenship. Congress's use of the conjunction "and" implies that § 1332(c) assumes all corporations have *both* a principal place of business *and* state of incorporation, and that Congress intended both requirements be fulfilled for diversity jurisdiction to be met. *China Basin Properties, Ltd. v. One Pass, Inc.*, 812 F. Supp. 1038, 1040 (N.D. Cal. 1993). Contrary to the plain language of the statute, the Third and Eleventh Circuits eschew principal place of business entirely for inactive corporations, while the Fourth and Fifth discard it where the corporation has been inactive for a substantial period of time.

Congressional intent and the plain meaning of § 1332(c) best support a modified version of the Second Circuit's "last transacted activity" approach. In *Passalacqua*, the Second Circuit held that a defunct corporation's citizenship is determined not only by its state of incorporation, but also by the place it last transacted business. 933 F.2d 131, 141 (2d Cir. 1991). The court acknowledged the need to look to both place of incorporation and principal place of business, and it noted Congress's intention to preclude inherently local corporations from asserting diversity jurisdiction based solely on their state of incorporation. *Id*.

But strict application of the Second Circuit's approach—that the last place an inactive corporation transacted any business is always determinative of citizenship—could "produce the odd result that an inactive corporation may be held to have its principal place of business in a jurisdiction in which it would never have been held to have its principal place of business while it was active." *See Harris*, 961 F.2d at 551. In light of this anomaly, the Court finds the better test to determine the citizenship of an inactive corporation is a "last principal place of business" approach. *See China*

*Basin*, 812 F. Supp. at 1040 (concluding that an inactive corporation is a citizen of both its state of incorporation and the state in which it has its last principal place of business); *Comtec, Inc. v. Nat'l Technical Schs.*, 711 F. Supp. 522, 525 (D. Ariz. 1989) ("Comtec's last principal place of business was California. For purposes of diversity jurisdiction, this Court concludes that California is still Comtec's principal place of business.").

The last principal place of business approach most strictly construes the diversity statute, as the Court is required to do under Ninth Circuit authority. *Kantor*, 704 F.2d at 1092. By retaining a corporation's dual citizenship for diversity purposes, the "last principal place of business" test reduces the frequency of complete diversity, thereby limiting federal jurisdiction. *Compare Harris*, 961 F.2d at 551 (effectively increasing likelihood of finding complete diversity by holding inactive corporations have only one state of citizenship), *with Passalacqua*, 933 F.2d at 141 (effectively decreasing likelihood of finding complete diversity by finding inactive corporations have two states of citizenship).

When Congress amended § 1332(c) to add principal place of business as a requirement for corporate diversity citizenship, it did not create an exception for defunct corporations. *Comtec*, 711 F. Supp. at 525. In accordance with the plain meaning of the statute, the last principal place of business test is the only test that recognizes diversity jurisdiction's prerequisite that all corporations have a principal place of business. *Id.* at 524–25; *China Basin*, 812 F. Supp. at 1040. This is the only approach that recognizes the necessity of both a place of incorporation and principal place of business while adhering to the *Hertz* direction that complex jurisdictional tests should be avoided. *Hertz*, 599 U.S. at 93. Unlike the "substantial length of time" approach's discretionary preliminary analysis, under this approach courts may simply apply *Hertz*'s "nerve center" test to determine an inactive corporation's citizenship, just as it would for any active corporation. *Id.* at 92–93.

/ / /

1    Furthermore, by precluding inactive corporations from removing inherently
2 local actions to federal court based solely on their states of incorporation, the last
3 principal place of business test is the only test consistent with the policy behind
4 diversity jurisdiction. *Passalacqua*, 933 F.2d at 141. Diversity jurisdiction's primary
5 function is to avoid potential local prejudice in state courts by providing a "neutral"
6 forum for non-resident litigants. *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 111
7 (1945). But, as in the case at hand, where an inactive corporation has previously
8 established substantial operations and local connections in a state, it is unlikely to
9 suffer local prejudice there and the policy therefore does not apply. *China Basin*, 812
10 F. Supp. 1038 (N.D. Cal. 1993); *see also Comtec*, 711 F. Supp. at 525. A defunct
11 corporation should not be able to evade a state court's jurisdiction over claims arising
12 out of local acts that occurred while it was still active in the state, just because it
13 happens to be incorporated in another forum.

14    Accordingly, the Court determines that the last principal place of business
15 rule—an inactive corporation is a citizen of both its state of incorporation and of the
16 state where it had its last principal place of business when it was active—is the most
17 appropriate determination of an inactive corporation's citizenship, as it is most in
18 concert with the policy behind § 1332(c), its plain text, and the Supreme Court's
19 denouncement of complex jurisdictional tests.

20 **B.    Red Strokes' Citizenship**

21    Having decided the most appropriate determination of a defunct corporation's
22 citizenship is its state of incorporation and its last principal place of business when
23 active, the Court need not address Red Strokes' "winding up" activities in Tennessee
24 after its doors were closed. Given the abovementioned purpose of § 1332, the Court
25 finds Red Strokes's history of local activities in California is not "irrelevant" as the
26 Defendants suggest. Under the last principal place of business test, Red Strokes is a
27 citizen of both Tennessee and California for diversity purposes.
28 / / /

1  Brooks alleges that because he lived in Nashville from 1994 to 2000, Red
2  Strokes's business decisions were made in Nashville. (Brooks Decl. ¶ 5, Harris Decl.
3  ¶¶ 6–7.) But this assertion is limited until 2000. Sanderson's earliest dated allegation
4  regarding business decisions (aside from the Los Angeles office locations, which
5  Defendants do not refute) is in 2001 for the project "Call Me Claus." (Sanderson
6  Decl. ¶ 18.) As noted, the Court is examining Red Strokes's *last* principal place of
7  business when active.

8  A corporation's principal place of business, or "nerve center," is usually its
9  headquarters, which the public often considers to be its main place of business. *Hertz*,
10 599 U.S. at 93. From 1993 to 2011, Red Strokes's office, though it moved from time
11 to time, was at all times located in Los Angeles; from 1998 to 2011 its only office was
12 at the Beverly Hills location. (Sanderson Decl. ¶¶ 6, 8.)

13 But because the headquarters is not always a corporation's principal place of
14 business, the Supreme Court more strictly defined principal place of business as the
15 place where its officers "direct, control, and coordinate the corporation's activities."
16 *Hertz*, 599 U.S. at 93. Red Strokes had only two officers, Brooks and Sanderson.
17 Brooks was the sole shareholder and President; Sanderson was the Chief Executive
18 Officer and Producing Partner. (*Id.* ¶ 5.) As an entertainment company, Red
19 Strokes's activities involved developing and producing film and television projects.
20 (*Id.* ¶ 2.)

21 Sanderson, who constituted half of Red Strokes's officers, conducted those
22 activities out of Los Angeles. She not only managed and oversaw the day-to-day
23 operations, but also coordinated the projects by arranging and attending meetings with
24 other Los Angeles-based entertainment companies. (*Id.* ¶¶ 11–23.) When he was
25 available, Brooks would accompany Sanderson to meetings on Red Strokes projects,
26 and he attended all pitch meetings at motion-picture studios and television networks in
27 Los Angeles County. (*Id.* ¶ 12.) Sanderson also directed the production of each of
28 Red Strokes's projects—she made hiring decisions, negotiated contracts, supervised

pre-and post-production activities, negotiated promotion of the films, and regularly met with studio and network officials, financiers, writers, producers, and talent, throughout the production process—all in Los Angeles. *Id.*

The fact that Brooks negotiated the use of his music in two Red Strokes projects from Tennessee does not come close to Sanderson's level of control and direction in Los Angeles. (Opp'n 15.) Moreover, Red Strokes had only one employee in its last five years—an executive assistant who worked under Brooks's and Sanderson's direction exclusively from the Beverly Hills location. (Sanderson Decl. ¶ 9.)

A corporation has only one *principal* place of business. Where a corporation carries on activities in several states, the nerve center test looks to where the officers direct, control, and coordinate activities "'in furtherance of the corporate objective.'" *Hertz*, 599 U.S. at 90–91 (quoting *Scot Typewriter Co. v. Underwood Corp.*, 170 F. Supp. 862, 865 (S.D.N.Y. 1959)). Maintaining a bank account and documents such as ledgers, tax returns, receipts, and business reports in Tennessee does not qualify as "directing, controlling, or coordinating" Red Strokes's corporate activities. *Hertz*, 599 U.S. at 93; (Brooks Decl. ¶ 5). Nor does hiring a third-party accounting firm, which happens to be run out of Tennessee, to handle various administrative tasks, qualify as an officer's furtherance of the entertainment company's corporate objective. (Harris Decl. ¶¶ 8–9.)

In sum, the evidence shows that—when active—Red Strokes's last center of direction, control, and coordination while it was an active corporation was located in Los Angeles, not in Tennessee. By all accounts, Red Strokes undertook the vast majority of its business in California. And Sanderson is indisputably a California citizen. Thus, neither Sanderson nor Red Strokes "faces a threat of bias if the action were to be resolved in state court." H.R. Rep. No. 112-10, at 8 (2011), *reprinted in* 2011 U.S.C.C.A.N. 576, 580.

Because complete diversity is therefore lacking between Red Strokes and Sanderson, the Court lacks subject-matter jurisdiction over this case.

### C. Judicial Estoppel

Defendants argue that Sanderson should be estopped from claiming that she and Red Strokes are not diverse because she has claimed the opposite to be true in a separate action in Tennessee. Constitutional concerns outweigh the Defendants' argument. Though the Court acknowledges Sanderson's blatant self-contradiction, it is irrelevant for purposes of determining whether diversity exists.

The Court must satisfy itself that Article III jurisdiction exists in any case before proceeding to the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). Either jurisdiction exits or it doesn't, and "no action of the parties can confer subject-matter jurisdiction upon a federal court." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). This necessarily means that "principles of estoppel do not apply" to matters of subject-matter jurisdiction. *Id.* (citing *Am. Fire & Casualty Co. v. Finn*, 341 U.S. 6, 17–18 (1951)). And when jurisdiction ceases to exist, as it does here, the Court's only power is to announce that fact and dismiss the case. *Ex Parte McCardle*, 74 U.S. 506, 514 (1868).

Defendants' argument relies heavily on the Ninth Circuit case *Milton H. Greene Archives, Inc. v. Marilyn Monroe, LLC*, 692 F.3d 983. This reliance is misplaced. Though, like here, that case did "turn on" the previously misrepresented domicile of a party, domicile did not go to subject-matter jurisdiction. Absent a threshold finding of jurisdiction over this matter, the Court cannot judicially estop Sanderson from asserting that the Court has no jurisdiction.

Because judicial estoppel cannot be used to challenge jurisdiction, the Court has no choice but to remand this case to Los Angeles Superior Court.

### V. CONCLUSION

For the reasons discussed above, the Court determines that it lacks jurisdiction over this matter and hereby **REMANDS** this case to the Los Angeles County Superior Court. Sanderson's request for attorney's fees and costs under 28 U.S.C. § 1447(c) is

**DENIED**.  In addition, Defendants' pending motion to dismiss is **DENIED AS MOOT**.  (ECF No. 9.)  The Clerk of Court shall close this case.

**IT IS SO ORDERED.**

July 3, 2013

                              _____
                              **OTIS D. WRIGHT II**
                              **UNITED STATES DISTRICT JUDGE**

13